EMMA LEWIS vs. AREA II HOMECARE FOR SENIOR
CITIZENS, INC. & another.[1]

Suffolk.   February 6, 1986. — June 16, 1986.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Anti-Discrimination Law*, Prima facie case, Burden of proof. *Practice,
  Civil*, Appeal.

Although a former employee met her threshold burden of establishing a
  prima facie case that her employer and its executive director, in denying
  her request for a two-month leave of absence to perform missionary
  work for her church, had discriminated against her on account of her
  race, the employee could not prevail on her claim where, after the
  defendants articulated legitimate, nondiscriminatory reasons for their
  action and offered credible evidence to show that the articulated reasons
  were not pretexts, she failed to carry her resulting burden of demonstrat-
  ing that they were. [765-770]
Although, in an action based upon allegedly discriminatory conduct by the
  plaintiff's former employer, the plaintiff's evidence amply supported
  her contention that missionary work was an essential part of her religion,
  she did not demonstrate that her religion imposed upon her an obligation
  to undertake missionary work at any specific place or time, and con-
  sequently, the plaintiff failed to establish a prima facie case that her
  employer, by refusing to grant her a two-month leave of absence to
  perform missionary work in the Philippines during the summer of 1983,
  had required her to violate or forgo the practice of her religion. [770-773]
In an action based upon allegedly discriminatory conduct by the plaintiff's
  former employer and its executive director, the plaintiff failed to dem-
  onstrate that certain issues which she sought to raise on appeal had
  actually been litigated at trial in the Superior Court. [773-774]

CIVIL ACTION commenced in the Superior Court Department
on October 28, 1983.

The case was heard by *Julian T. Houston*, J., sitting under
statutory authority.

---

[1] Kathleen Kelly.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Robert C. Johnson, Jr.*, for the plaintiff.

*Walter H. Mayo, III*, for the defendants.

LYNCH, J. The plaintiff, a black woman and a member of the Pentecostal faith, brought this action against her former employer and its executive director. The plaintiff's employment was terminated when she took a two-month leave of absence to do missionary work abroad for her church, despite the fact that her request for this leave had been denied. On October 28, 1983, the plaintiff filed a complaint in the Superior Court seeking temporary and permanent injunctive relief preventing the defendants from filling the position from which she had been dismissed and a permanent injunction ordering the defendants to reinstate her to her former position. She also sought monetary damages. The motion judge granted the plaintiff's request for a temporary restraining order,[2] and ordered the case advanced for a speedy trial on the merits. The case was heard jury-waived. In his "Findings of Fact, Rulings of Law and Order for Judgment," the trial judge denominated the plaintiff's action as one "seeking relief under G. L. c. 151B, § 4 subsections 1 and 1A" for racial and religious discrimination and ordered judgment for the defendants. The plaintiff appealed, and we transferred the case here on our own motion. In addition to challenging the judge's ruling regarding the racial discrimination claim under G. L. c. 151B, § 4 (1) (1984 ed.), the plaintiff contests the ruling that a two-month leave of absence for missionary work is not protected by G. L. c. 151B, § 4 (1A) (1984 ed.), and that the purpose of subsection (1A) is essentially to protect people who observe a Sabbath or holy day other than the Christian Sunday. The plaintiff also argues that the judge's failure to address other causes of action alleged in her complaint and purportedly litigated at trial is reversible error. We affirm.[3]

---

[2] According to the docket, a motion judge later ordered a preliminary injunction as well.

[3] Neither the parties nor the judge apparently questions the validity of the discrimination claims under G. L. c. 151B, § 4 (1984 ed.), although the record

We summarize the facts found by the judge. In September, 1979, the plaintiff was hired as a case manager by the defendant, Area II Homecare for Senior Citizens, Inc. (Area II), which provides homemaker services to elderly citizens residing in its service area in Boston. During the hiring process, the plaintiff made known her need to take a leave of absence in 1980 in order to do missionary work for her church. Calvin Johnson, then the executive director, accepted that condition when he approved the plaintiff's employment. There was no discussion regarding any leave of absence other than the one to be taken in 1980. Shortly after being hired by Area II, the plaintiff was absent from work due to medical problems and she was advanced sick leave and compensatory time to cover her absence. In July, 1980, the plaintiff's written request for a leave of absence to do missionary work in the fall was approved, and she took the leave for a month and a half in September and October, 1980. The plaintiff was promoted to case manager supervisor in 1980. In 1982, the plaintiff took

---

does not show, and the plaintiff does not allege, that she ever filed a complaint with the Massachusetts Commission Against Discrimination (MCAD). See G. L. c. 151B, § § 5, 9 (1984 ed.). Under c. 151B, § 9, a civil action may be brought in Superior Court "at the expiration of ninety days after the filing of a complaint with the commission, or sooner if a commissioner assents in writing." In *Melley* v. *Gillette Corp.*, *post* 1004 (1986), this court adopted both the analysis and conclusion of the Appeals Court opinion. 19 Mass. App. Ct. 511 (1985). The Appeals Court opinion stated that G. L. c. 151B, § 5, represents a "clear suggestion that a litigant is first to follow the administrative route [and this interpretation of the statute] accords with the usual requirement that administrative remedies are to be exhausted before resort is had to the courts." 19 Mass. App. Ct. at 512. See *East Chop Tennis Club* v. *Massachusetts Comm'n Against Discrimination*, 364 Mass. 444, 448 (1973). The *Melley* opinions affirmed the dismissal of an age discrimination claim where the plaintiff did not comply with the procedural requisites of c. 151B.

The instant action was commenced when the plaintiff filed her complaint seeking temporary relief. Section 9 of c. 151B further provides that an "aggrieved person may also seek temporary injunctive relief in the superior [court] . . . at any time to prevent irreparable injury during the pendency of or *prior to* the filing of a complaint with the commission" (emphasis added). We do not today decide what subsequent procedural steps are required when a party seeks injunctive relief in the Superior Court prior to filing a complaint with the MCAD.

a two-month leave of absence for medical reasons, and also took accrued sick and annual leave time.

On February 14, 1983, the plaintiff wrote to her supervisor, Linda O'Connor, requesting a two-month leave of absence from June 20, 1983, to August 27, 1983. The plaintiff had been asked by her church to serve as a missionary during this period and she wished to honor this request. On February 22, 1983, the plaintiff's superiors informed her that they would review her request, and on March 9, they completed a review of the plaintiff's records and decided to recommend that her request for a leave be denied. The next day they met with the plaintiff and explained to her why they were denying her request. They discussed various alternatives for covering the plaintiff's staff and caseload for the two months the plaintiff proposed to leave, and told the plaintiff why they were unacceptable. The plaintiff was told that the only condition under which the leave could be approved would be if Area II received a new case manager supervisor's position from the Department of Elder Affairs (DEA), and had hired and trained the person for that position by June 20, the date the plaintiff's leave was to begin.[4] At a subsequent review, the reasons given for the denial of the plaintiff's request were departmental overload, high supervisory loads, and the department's negative experience with a supervisor's two-month leave in 1981. It was also stated that no responsible or workable way existed to hire a temporary supervisor from within the staff or outside, and it was concluded that a two-month leave by the plaintiff at the time requested would have "a damaging effect on other employees and the Department as a whole." The plaintiff took a leave of absence without approval, and sent a note to her supervisor on June 17 so informing her. In July of 1983, after a vote of Area II's full board of directors, the plaintiff was informed that she had been terminated as a case manager supervisor and that she could return to Area II as a case manager.

---

[4] The request to DEA for the new position was made on April 14, 1983. Although follow-up telephone calls to DEA were made by Kathleen Kelly, executive director of Area II, DEA did not approve a new supervisor's position until August 10, 1983.

1. *Racial discrimination in employment.* This court has previously set forth the proof which is necessary to establish unlawful discrimination in violation of G. L. c. 151B. *Wheelock College* v. *Massachusetts Comm'n Against Discrimination*, 371 Mass. 130 (1976). The plaintiff has the initial burden of establishing a prima facie case of racial discrimination. *Id.* at 138. See *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802 (1973). The burden then shifts to the defendants to produce a lawful explanation for the treatment accorded the plaintiff. *Wheelock College, supra.* See *McDonnell Douglas Corp., supra; Furnco Constr. Corp.* v. *Waters*, 438 U.S. 567, 577 (1978). If the defendants meet this burden, the plaintiff must prove that the explanation given by the employer is a pretext, that is, it lacks reasonable support in evidence or is wholly disbelievable. *Wheelock College, supra* at 138-139. *Smith College* v. *Massachusetts Comm'n Against Discrimination*, 376 Mass. 221, 230 (1978). See *Texas Dep't of Community Affairs* v. *Burdine*, 450 U.S. 248, 256 (1981). *McDonnell Douglas Corp., supra* at 804-805. The ultimate burden of persuading the fact finder that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Texas Dep't of Community Affairs* v. *Burdine, supra.* *Wheelock College, supra* at 139. The judge found, and the defendants concede, that the plaintiff did establish a prima facie case of racial discrimination.[5] The plaintiff, however, takes issue with the judge's rulings that the defendants successfully rebutted the plaintiff's prima facie case, and that the plaintiff failed to prove pretext.

After the plaintiff has met her threshold burden of establishing a prima facie case, the burden which shifts to the defendants is that of production only, they must articulate a legitimate nondiscriminatory reason for their action and "produce credible evidence to show that the reason or reasons advanced were

[5] The judge found that the plaintiff made out a prima facie case since she was black, qualified for the position of case manager supervisor, was terminated from that position and demoted to case manager, and Area II continued to recruit for the position of case manager supervisor. See *Wheelock College, supra* at 135 & nn.5 & 6. See also *Trustees of Forbes Library* v. *Labor Relations Comm'n*, 384 Mass. 559, 565 n.4 (1981).

the real reasons." *Sarni Original Dry Cleaners, Inc.* v. *Cooke*, 388 Mass. 611, 614-615 (1983), quoting *Wheelock College, supra* at 138. See *Trustees of Forbes Library* v. *Labor Relations Comm'n*, 384 Mass. 559, 566-567 (1981); *Smith College* v. *Massachusetts Comm'n Against Discrimination, supra* at 230. The judge concluded that the defendants did articulate legitimate, nondiscriminatory reasons for their action and found these reasons to be "departmental overload, staff stress, and an unsatisfactory experience with an extended absence of a Case Manager Supervisor in 1981." More precisely, the reasons given for denying the plaintiff's request were: pressure and overload in the client services department; extremely high supervisory loads in that department created by the fact that other supervisors would be taking earned vacations during the summer months; and the department's unsatisfactory experience in 1981 as a result of a supervisor's two-month leave of absence. These "articulated reasons" are legitimate and nondiscriminatory.[6] We reiterate that the employer's burden following a prima facie showing of discrimination is "only a responsibility to produce evidence. Once the employer has proposed a reason and presented supporting facts, the presumption of discrimination is dispelled. . . . The employer need not *persuade* the trier that it was correct in its belief" (citations omitted, emphasis in original). *Trustees of Forbes Library* v. *Labor Relations Comm'n, supra* at 566. The reasons given for a decision may be unsound or even absurd, but if they are not discriminatory and if the plaintiff does not prove they are pretexts, the plaintiff cannot prevail. See *Smith College, supra* at 229.

The plaintiff, however, contends that the judge committed error by allegedly failing to "determine whether [the defendants'] reasons were supported by underlying facts." The judge's findings do not specifically identify facts which the defendants produced to support the reasons given for their action. He stated that the "case turns on whether the plaintiff has proven that the reasons articulated by the defendants for the denial of the plaintiff's request . . . were a pretext for a racially dis-

---

[6] The plaintiff does not argue that the defendants gave any reasons for their action other than those found by the judge.

criminatory motive" and ruled that the defendants' treatment of the plaintiff showed no discrimination. Since the record clearly shows that the defendants introduced credible evidence to show that the articulated reasons were not pretexts,[7] the burden shifts to the plaintiff to demonstrate that the reasons were pretexts, *Wheelock College* v. *Massachusetts Comm'n Against Discrimination, supra*. The judge found that the plaintiff failed to sustain this burden, therefore the plaintiff cannot prevail unless she can show that the evidence required finding in her favor. It is apparent from the facts previously stated that the plaintiff has not demonstrated that she has overcome this difficult burden.

The judge correctly recognized that, absent direct proof of racial discrimination, evidence which may be relevant to the plaintiff's showing of pretext may include application of a certain criterion to employees of different races; the employer's general practice and policies concerning employment of racial minorities; and the employer's treatment of the plaintiff during her employment. See *McDonnell Douglas Corp., supra* at 804-805; *Osborne* v. *Cleland*, 620 F.2d 195, 198 (8th Cir. 1980). See also *Smith College, supra* at 228 (fact of discrimina-

---

[7] There was testimony that the idea of distributing the plaintiff's work to the other supervisors while the plaintiff took her two-month leave was rejected, because it would add to the workload of the supervisors who were already very burdened, and that, since it was summer, people would be taking their accrued vacation time which would only contribute to this burden. In addition, two of the six case managers supervised by the plaintiff had been granted maternity leaves that summer, and the workload of a supervisor increases when case managers are absent. The director of the plaintiff's department testified that the "extra load would be simply untenable" if other supervisors were asked to absorb the plaintiff's case manager staff and caseload. She stated that the additional responsibility of just one case manager creates "a lot more work," for a supervisor, although an extra person is easier to manage for short periods of time. She detailed the day to day responsibilities of case manager supervisors to demonstrate the burden of assuming responsibility for an absent supervisor's case managers. There was testimony that the 1981 two-month leave of a supervisor caused stress. The supervisors, who absorbed the absent supervisor's case manager staff, experienced an increased workload. Moreover, it proved difficult for the transferred case managers to change their way of doing things for a couple of months to fit the methodology of a new but temporary supervisor.

tory motive "can be inferred from differences in the treatment of [employees of different races]").

In considering whether decisions for leaves of absence were made according to the same criteria for supervisory employees regardless of race, the judge ruled that there was "no proof of differential treatment of minorities and white employees under the same set of facts." He found that there was no evidence that any white employees were granted a two-month leave of absence in the summer of 1983. The plaintiff argues that the evidence established that white employees who requested leaves got them. The plaintiff lists seven white employees who were granted leaves of absence during the years 1980-1983. It is significant, however, that only two of these individuals were case manager *supervisors*. The testimony discussed, see note 7, *supra*, concerning the difficulty with prolonged supervisory leaves in general, and the unsatisfactory experience with one two-month leave in 1981, was substantial. Moreover, the leaves taken by many of these white employees were comprised fully or partially of *"earned"* or accrued leave time. The judge found as a fact that Area II has a policy that such "earned" time takes precedence over leaves of absence without pay, and this finding was supported by the record. The judge also found that, regarding a supervisor's leave in July, 1983, the absence had consisted of 127 hours, less than half the time the plaintiff proposed to take, and consisted of *earned* vacation time. The plaintiff does not deny that she herself had been granted extended leaves of absence prior to the time she became a supervisor, and was permitted a two-month medical leave after she became a supervisor.

The judge found that there was substantial evidence that the plaintiff was fairly treated during her employment at Area II and that the defendants' treatment of her was favorable rather than discriminatory. On our close review of the record we believe that it cannot be successfully maintained that the finding was not supported by the evidence.[8]

---

[8] He found that the defendants' fair treatment of the plaintiff was demonstrated by: their granting her the 1980 leave of absence to do missionary work; promoting her to supervisor; the favorable evaluation by her supervisor

The plaintiff next contends that the evidence established that Area II was generally discriminatory in its treatment of minority employees and that the judge's conclusion to the contrary was, therefore, error. The judge found that the plaintiff offered no conclusive evidence of pretext in the defendants' general practices and policies regarding employment of minorities. He found that the defendants demonstrated that the percentage of minority administrative and management employees increased from 0% to 40%,[9] since the time Kelly was executive director

in 1981; the extended medical leaves Area II granted the plaintiff in 1979 and 1982; by the 1979 offer and loan of sick leave and compensatory time so that the plaintiff would be paid when she had not worked long enough to accrue sick leave. We are not persuaded by the plaintiff's various arguments concerning her claim that she was poorly treated following Kelly's assumption of the executive director's position.

[9] The plaintiff objected at trial, and argues now on appeal, that the judge admitted testimony in violation of the best evidence rule. Kelly became executive director in 1981. On direct examination she began to testify as to the percentage of minority employees employed by Area II in 1979. Plaintiff's counsel objected and the following exchange ensued:

| | |
|---|---|
| DEFENSE COUNSEL: | "Ms. Kelly, in your capacity as Executive Director, do you have control of the files and records of Area II?" |
| WITNESS: | "Yes, I do." |
| DEFENSE COUNSEL: | "And among those records, is there an Affirmative Action Plan for 1979?" |
| WITNESS: | "For fiscal year '79, yes." |
| DEFENSE COUNSEL: | "Have you reviewed that Affirmative Action Plan?" |
| WITNESS: | "Yes, I have." |
| DEFENSE COUNSEL: | "And from your review of that Affirmative Action Plan, what was the percentage of minority employees at Area II in 1979?" |
| PLAINTIFF'S COUNSEL: | "Objection again, your Honor. The best evidence of what it says is the document itself not the witness' interpretation." |
| THE COURT: | "Do you have any response?" |
| DEFENSE COUNSEL: | "I think she's — she's reviewed the plan in preparation for her testimony here." |
| THE COURT: | "Go ahead." |
| WITNESS: | "Thirty-three percent." |

The defendant was not attempting to prove the contents of the affirmative action plan but rather was attempting to prove through the witness the

of Area II, and the percentage of members of minority groups employed by Area II in 1983 was 41.5% These statistics are reasonably supported by the record.[10] The judge properly considered the data concerning the expanding number of minority group members in management positions, as well as the fact that of the three case manager supervisors hired for the positions which became available in 1983, one was black.

On our thorough review of the record, giving "due regard" to the "opportunity of the trial court to judge the credibility of the witness," Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974), we are not left with a conviction that a mistake has been committed. We hold that the plaintiff did not meet her burden to prove that "but for" her race, *Smith College, supra* at 227 n.8, Area II would not have taken the action against her that they did.

2. *Religious discrimination.*[11] Chapter 151B, § 4 (1A), provides: "It shall be unlawful discriminatory practice for an em-

minority composition of the office in 1979. The witness's knowledge of this fact came from the plan. The witness therefore was relying upon a statement in the plan to support her testimony in court. The statement therefore was hearsay. It is not necessary for us to examine whether the hearsay is admissible under any exception because the plaintiff's objection was defective. See *Kagan* v. *Levenson*, 334 Mass. 100, 107 (1956) (party who offered specific objection to evidence at trial, where overruled, may not before this court argue other grounds for exclusion); P.J. Liacos, Massachusetts Evidence 73 (5th ed. 1981). See also *Commonwealth* v. *Gullick*, 386 Mass. 278, 281 (1982), and cases cited.

[10] The plaintiff's only challenge to these statistics is the suggestion that since *she* is black and obtained the case manager supervisor position in the fall of 1980, the judge's finding that there were 0% members of minority groups in management positions when Kelly came to Area II, is wrong. As Kelly came to Area II in 1981, and as the plaintiff's promotion was initially probationary, and did not achieve full permanent supervisory status until May, 1981, presumably after Kelly took over as executive director, we cannot say that the judge was plainly wrong.

[11] The plaintiff appears to allege a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(j) (1982). See 42 U.S.C. § 2000e-2 (1982). No action alleging a violation of Title VII may be brought unless the plaintiff has filed a charge concerning the alleged discrimination with the United States Equal Employment Opportunity Commission (EEOC). 2 A. Larson, Employment Discrimination § 48.31 (1985). The plaintiff does not allege, and review of the record does not disclose, that she filed a charge with the EEOC. Moreover, because the MCAD is a State

ployer to impose upon an individual . . . any terms or conditions, compliance with which would require such individual to violate, or forgo the practice of, his creed or religion as *required* by that creed or religion including but not limited to the observance of any particular day or days . . . as a sabbath or holy day and the employer shall make reasonable accommodation to the religious *needs* of such individual. . . . The employee shall have the burden of proof as to the required practice of his creed or religion." (Emphasis added.) The judge ruled that the purpose of § 4 (1A) is to "permit employees to practice their religion and to require employers to accommodate an individual employee's religious needs by permitting the employee to worship when he is so required by the tenets of his faith." He therefore ruled that there is "[n]othing in the language of [§ 4 (1A) to support] the plaintiff's contention that she is entitled to take a two month leave of absence to do missionary work." We agree with the judge's ultimate conclusion that the plaintiff did not make out a claim of religious discrimination under G. L. c. 151B, § 4 (1A). In light of the view we take of the plaintiff's case, however, it is not necessary to consider the judge's interpretation of the statute.

The statute does not deal with the full panoply of religious beliefs, practices, preferences, and ideals. Such a statute would create difficult if not impossible problems of application and enforcement. Neither do constitutional considerations suggest such an interpretation of the statute. See *United States* v. *Boardman*, 419 F.2d 110, 112 (1st Cir. 1969), cert. denied, 397 U.S. 991 (1970) ("The Constitution does not extend the same degree of protection to every manifestation of religious impulse"). The application of the statute is much more narrow. It prohibits an employer from requiring an employee, as a condition of employment, to violate or forgo the *practice* of

"deferral agency," see *Hadfield* v. *Mitre Corp.*, 562 F.2d 84 (1st Cir. 1977) (Massachusetts is a deferral State), Federal law requires a complaint to be filed with the MCAD before a Title VII action can be brought. See 42 U.S.C. § 2000e-5(c) (1982); 29 U.S.C. § 626(d) (1982). See also *Love* v. *Pullman Co.*, 404 U.S. 522 (1972). The plaintiff does not claim to have complied with these procedures and we therefore do not consider her Title VII claim.

her religion as *required* by that religion. It follows that the threshold showing an employee must make is whether the activity sought to be protected is a religious practice and is required by the religion. The inquiry in considering the plaintiff's claim of religious discrimination under the statute is *not* whether missionary work in general is a required practice of her religion. Neither is it of relevance that such work may be a practice which her church required of her specifically. The plaintiff sought a leave to do missionary work in the Philippines for two months in the summer of 1983. The defendants denied this leave request. In order to succeed in her claim, therefore, the plaintiff must introduce sufficient evidence to show that it was a requirement of her religion that she spend two months in the Philippines in the summer of 1983. This she has failed to do.

There is no question but that the evidence amply supports the plaintiff's contention that missionary work was an essential part of her religion. What is missing is a demonstration that her religion imposed upon her an obligation to perform this missionary work for two months in the Philippines in the summer of 1983. One might expect that religious tenets would take into consideration the practical constraints imposed upon any members who must depend upon secular activities to provide the basic necessities of life. It is not for this court to decide, however, what is properly required of any adherent to a particular set of religious beliefs. Our duty is much more limited. We must merely ascertain if the plaintiff introduced sufficient evidence to warrant a finding that she met the statutory requirements. The plaintiff's case in this regard rests on the testimony of her pastor. He testified that, although missionary work was a required religious practice for those members of the church who qualified, the church does not require that missionary work be conducted overseas. Then on direct examination the following exchange took place:

PLAINTIFF'S COUNSEL:    ". . . [W]hen was the last time that you required [the plaintiff] to conduct missionary work?"

WITNESS:              "In December."
PLAINTIFF'S COUNSEL:  "And for what country?"
WITNESS:              "The Philippines."

He then testified that missionary work was an essential aspect of the plaintiff's religious observance and practice but that, if it had become necessary, the church would have been willing to agree that she be away for four weeks instead of eight.

We conclude that this testimony is insufficient to warrant the conclusion that without an eight-week leave of absence in the summer of 1983, the plaintiff was being required to violate or forgo the practice of her religion.

3. *Plaintiff's other claims.* The plaintiff asserts that claims, listed in the complaint, of retaliation, breach of implied covenant of good faith and fair dealing, breach of contract, denial of due process, and intentional infliction of mental distress, were litigated below. Consequently, she contends that, since the judge failed to adjudicate these claims in his "Findings of Fact, Rulings of Law and Order for Judgment," there is no judgment on any of the claims. See Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974). The plaintiff maintains that this constitutes reversible error. Nowhere in the plaintiff's two paragraph discussion of this issue does she cite testimony or argument [12] to support her allegation that these claims were actually litigated. Plaintiff's counsel made no closing argument, and if counsel submitted proposed findings and rulings, they have not

---

[12] The plaintiff does cite her counsel's opening remarks wherein counsel stated that the case contained a "claim of breach of contract" and that an "expressed condition of employment . . . [was that the plaintiff would] be allowed to take leave for missionary work." Counsel also verbally alleged a breach of implied covenant of good faith and fair dealing. None of the other claims mentioned in the complaint, but not ruled on by the judge, were referred to.

We observe that, as to the contract claim, the judge found as a fact that Johnson hired the plaintiff on the condition that she be allowed to take a leave of absence in 1980, but that there was no discussion as to any leave other than that one. This finding was well supported by the evidence, being contested only by the testimony of the plaintiff herself. This finding is fatal to any claim that a condition of the plaintiff's employment provided for leaves of absence to do missionary work in any year other than 1980.

been included in the record for this court's review. We deem the plaintiff's remarks on this matter to exhibit but the merest glimmer of appellate argument and accordingly do not consider this issue. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). Cf. *Langlitz* v. *Board of Registration of Chiropractors*, 396 Mass. 374, 376 n.2 (1985), and case cited.

*Judgment affirmed.*