# Robert L. Scott *vs.* Boston Housing Authority & another.[1]

No. 00-P-354.

Suffolk. February 15, 2002. - October 24, 2002.

Present: Jacobs, Kass, & Berry, JJ.

*Boston Housing Authority. Anti-Discrimination Law,* Age. *Employment,* Discrimination. *Practice, Civil,* Instructions to jury, Special verdict, Judgment notwithstanding verdict.

At the trial of a complaint alleging age discrimination in employment, the judge erred in instructing the jury that they were required to find for the plaintiff if they found that the plaintiff had proved that the defendant's reason for terminating the plaintiff's employment was not believable or was not the real reason for the nonrenewal of the plaintiff's contract; however, the error was not of reversible dimension, because the jury, in their answers to special verdict questions put to them by the judge, in substance made findings that the defendant wilfully had acted with a discriminatory animus. [290-294] Berry, J., concurring.

At a civil trial, the judge did not err in denying the defendant's motions for a directed verdict and for judgment notwithstanding the verdict, where the jury's finding, on the evidence, was not irrational. [294-295]

Civil action commenced in the Superior Court Department on September 26, 1988.

Following review by this court, 42 Mass. App. Ct. 1106 (1997), the case was tried before *Peter M. Lauriat,* J.

*Wilbur E. Commodore* for the defendants.

*Frederick T. Golder* for the plaintiff.

Kass, J. On the basis of a jury verdict, the trial judge ordered entry of a judgment that the Boston Housing Authority (BHA) and its general construction superintendent, Robert A. Firth, had acted in violation of G. L. c. 151B, § 4, by failing to renew the plaintiff Robert L. Scott's contract with that agency. The unlaw-

---

[1]Robert A. Firth.

ful discrimination, as found by the jury, was based on age. Aggregate damages assessed against the defendants under the judgment came to $751,436.[2]

The appeal, lodged on behalf of both defendants, falls into two parts: first, that the defendants were entitled to allowance of their timely motion for judgment notwithstanding the verdict or a new trial on the ground that there was no evidentiary support for the jury's answer to a decisive special verdict question; and second, that the defendants were entitled to their motion for judgment notwithstanding the verdict because the evidence, taken in the light most favorable to the plaintiff, did not support a rational inference by the jury that the defendants had discriminated against Scott on account of age. We affirm.

1. *Procedural history.* There had been two previous trials. At the first trial, the jury found for the defendants on the age discrimination claims; were deadlocked on a race discrimination claim; and found for the plaintiff against Firth for tortious interference with Scott's contractual relationship with the BHA. The judge in that first trial allowed a motion for judgment notwithstanding the verdict on the count for tortious interference. The case then proceeded to a second trial confined to the issue that the first jury could not resolve, the race discrimination claim. This time, the jury returned a verdict for the defendants on that account. On appeal, we vacated the verdicts and judgment in the first trial because the trial judge, in response to a communication from the jury that they were deadlocked on the claim of race discrimination, had engaged in a discussion with the jurors, had responded to their questions, and had supplemented his instructions with neither the parties nor their counsel present. We expressed our concern that the irregularity of the colloquy between the judge and the jury might have infected the integrity of the jury verdicts and, as noted, we ordered that the judgment in the first trial be vacated. We affirmed the judg-

[2]The components of the judgment were as follows: (1) For lost wages and benefits, $248,000. Those damages were doubled because the jury found that the defendants knew or had reason to know that their conduct with respect to Scott violated the law against age discrimination. See G. L. c. 151B, § 9. Total compensatory damages, therefore, came to $496,000. (2) For emotional distress, $65,000, doubled under G. L. c. 151B, § 9, to $130,000. (3) On account of counsel fees, $121,875, and legal costs of $3,561.

ment in the second trial.[3] That took race discrimination out of the case, leaving age discrimination and tortious interference for the third trial. Our memorandum of decision in the appeal was unpublished; the orders are reported at 42 Mass. App. Ct. 1106 (1997).

2. *Facts.* The BHA first hired Scott in 1976 as a contract laborer, i.e., he was not placed on the BHA payroll but entered into a six-month contract with the BHA to work as a glazier (his trade) in the rehabilitation of apartments operated by the BHA.[4] At the end of the six months, the crew of which Scott was a part was let go because the BHA had run out of money for rehabilitation work. Two or three weeks later Scott was given a new contract to do window glazing work. By October, 1981, Scott's contract with the BHA provided that he work in the capacity of "foreman/glazier." That contract was, again, for six months.

The next contract, dated April 1, 1982, provided that the BHA "desires to engage the contractor in the capacity of crew supervisor" for a period of one year. Until 1987, the BHA continued to renew Scott's annual contracts. During 1986, he was assigned to supervise work at the Bromley-Heath project. By letter dated January 27, 1987, the executive director of the Bromley-Heath Tenant Management Corporation wrote to Scott that "due to the unavailability of sufficient funds," Scott's services as a crew supervisor would be terminated effective January 30, 1987.[5] Through the intercession of David Gillis, the acting director of the BHA's "force account," Scott was rehired in February, 1987, for a six-month term. Thereafter, there was no renewal. When Scott's employment by the BHA ended, he was 48 years old.

At the time the BHA did not re-up with Scott, the general construction superintendent of the BHA was Robert A. Firth.

---

[3] At the third trial, the jury found for Firth on Scott's claim of tortious interference.

[4] There was evidence that the BHA used the contract labor device to avoid putting construction trade workers, for whom there was fluctuating need, on a permanent payroll, which included benefits.

[5] We infer from the record that the Bromley-Heath Tenant Management Corporation acted as an agent for the BHA in the administration of work at the BHA's Bromley-Heath project.

He had arrived on the scene in 1986. Firth's avowed reason for casting Scott adrift was that the BHA's rehabilitation fund was in one of its periodic states of depletion; cuts needed to be made. Notwithstanding the money shortage, Firth was able to keep as construction supervisors his brother-in-law, James Mordant, age 38, and his cousin, Paul Gallant, and he found jobs at the BHA for two other brothers-in-law, one as assistant general construction superintendent, and another as a laborer. In 1987, the year in which Scott's engagement by the BHA ended, the BHA retained or initiated contracts with construction supervisors aged 46 (two such persons), 47, 57, and 61.

3. *The jury charge and the jury verdict.* The jury returned their verdict on the basis of seventeen written special verdict questions. Subsequent case law has recommended against putting employment discrimination cases to a jury on the basis of special questions that stratify jury deliberations into a structure of analysis originally expounded in connection with criteria for deciding such cases on a motion for summary judgment. See *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 508 (2001); *Ventresco* v. *Liberty Mut. Ins. Co.*, 55 Mass. App. Ct. 201, 209 (2002).

In the light of subsequent decisional history, the special questions were wrong in a significant respect. In a trilogy of cases, the Supreme Judicial Court has illuminated that the central issue in employment discrimination cases is whether the employment decision, e.g., discharge, failure to promote, failure to hire, was the result of discriminatory animus. To put it another way, the *real* reason for the employment decision must be based on unlawful considerations of age, sex, race, color, religion, or sexual orientation. *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 117-119 (2000). *Lipchitz* v. *Raytheon Co.*, *supra* at 504-506. *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 775 (2001).

The judge, concerning what by way of shorthand we may call the "pretext" point, instructed the jury as follows: "If you find the plaintiff has proven that the defendant's reason is not believable, or not the real reason for the non-renewal of the plaintiff's contract, then you *must* find in favor of the plaintiff on his age discrimination claim" (emphasis added). In light of the trilogy of cases cited above, this was error. Unless a court

expresses that a decision shall have prospective effect only, common law decisions of our courts apply to past as well as future proceedings or transactions. *Payton* v. *Abbott Labs*, 386 Mass. 540, 565-570 (1982). That error, even had it been objected to, was not of reversible dimension, however, because it was washed away by the jury's answer to two of the subsequent written special verdict questions put to them by the judge.

By the first written question, the jury were asked whether Scott had presented a prima facie case of discrimination on the basis of age.[6] They answered, "Yes." Second, the jury were asked:

> "Did the [BHA] articulate, and present evidence in support of a legitimate, non-discriminatory reason for not renewing Mr. Scott's contract in August of 1987?"

They answered, "No."

In support of its motion for judgment notwithstanding the verdict, the BHA focused particularly on the inconsistency of that response with the evidence. It urged that it had articulated, and submitted evidence in support of, a legitimate, nondiscriminatory reason for not giving Scott a new contract in 1987, namely, that the BHA was out of money for the rehabilitation projects on which Scott had been working. The record supports the BHA. Contracts between Scott and the BHA that contained express provisions that they were subject to funding had been admitted in evidence. This was evidence that the rehabilitation work rested on uncertain financial footings. Firth testified that

---

[6] A decidedly condensed version of the classic framework for analyzing employment discrimination cases, first articulated in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-805 (1973), and then applied in Massachusetts in *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 138-139 (1976), would be as follows. *Step one*: the prima facie case (the plaintiff is a member of a protected class, performed at an acceptable level, was fired, and replaced with someone of similar qualifications). *Step two*: the employer gives a lawful reason for why it fired the plaintiff. *Step three*: the plaintiff may show that the reason the employer gave for firing the plaintiff was a pretext. *Step four* (as clarified by the recent trilogy of cases): the plaintiff must show that the real ground for discharge was discriminatory animus. Cases that applied and fine tuned the analytical framework are collected in *Johansen* v. *NCR Comten, Inc.*, 30 Mass. App. Ct. 294, 297-301 (1991).

the reason the contracts with Scott came to an end was that funds for the particular work that Scott had been doing had dried up. That testimony was corroborated by a letter placed in evidence from the executive director of the Bromley-Heath Tenant Management Corporation, informing Scott of the "phasing out of the Vacancy Rehab Program at Bromley-Heath" because of funding shortfall. Scott had administered work under that program.

If we give meaning to the words of the second question, which faithfully reflected the inquiry to be made in stage two of the framework of analysis for employment discrimination cases, the BHA *had articulated* and *had presented evidence* of a legitimate, nondiscriminatory reason for not renewing Scott's contract. Whether the jury believed that evidence and thought this was the real reason for not renewing Scott's contract was a question for a later phase of the inquiry. The point was emphasized in *Lewis* v. *Area II Homecare for Senior Citizens, Inc.*, 397 Mass. 761, 766 (1986): "We reiterate that the employer's burden following a prima facie showing of discrimination is 'only a responsibility to produce evidence. Once the employer has proposed a reason and presented supporting facts, the presumption of discrimination is dispelled. . . . The employer need not *persuade* the trier that it was correct in its belief' (citations omitted, emphasis in original). *Trustees of Forbes Library* v. *Labor Relations Comm'n*, [384 Mass. 559,] 566 [1981]. The reasons given for a decision may be unsound or even absurd, but if they are not discriminatory and if the plaintiff does not prove they are pretexts, the plaintiff cannot prevail." See *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 254-255 (1981), and *Reeves* v. *Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000), similarly stating that at the second phase of the framework of analysis, the employer's burden is the introduction of admissible evidence of the nondiscriminatory reason that the employer had for its action regarding the plaintiff. That phase does not involve a credibility assessment of that evidence.[7] *Reeves* v. *Sanderson Plumbing Prod., Inc.*, supra.

[7]Many of the cases describe the defendant's obligation in phase two as having to produce "credible" evidence to support its articulated reason for the

As the special verdict questions were constructed, once the jury answered the second question "no," they were to skip the third question and proceed to assessing damages.[8] The third question asked:

"Has Mr. Scott proven that the reason given by the defendant [BHA] for not renewing his contract in August of 1987 was a false reason or not a real reason?"

At this juncture we must consider the consequences of the failure to instruct that the plaintiff must prove not only that the BHA's proffered reason for not renewing his contract was not a real reason for failing to renew his employment, but also that the BHA had acted with a forbidden discriminatory purpose. We must also consider the consequences of the jury having

employment action taken against the plaintiff. See, e.g., *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 442 (1995); *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997). The addition of the adjective "credible" is likely to be confusing to jurors who, untutored in exquisite legal distinctions, will reasonably understand that deciding whether credible evidence has been received means deciding whether they believe, i.e., credit, that evidence. Special verdict question number two asked simply: did the BHA present evidence of a legitimate reason for its action? The trial judge delivered his charge to the jury in speech, as is customary, and also reduced his instructions to writing, providing the jury with copies to take into their deliberations. In both the oral and written forms, the judge charged the jury that there is a three-stage order of proof. If the plaintiff proves his prima facie case, the judge told the jurors, "then the burden shifts to the defendants to articulate, and present evidence in support of a legitimate, non-discriminatory reason for no[t] renewing the plaintiff's contract with the BHA in August of 1987. In this case, the defendants' stated reason was the lack of funds. If the employer does not produce such evidence, then the defendant is presumed to have discriminated, and the plaintiff is entitled to judgment in his favor." Then the judge proceeded to say (and write), "If you find that the defendant has articulated a legitimate, non-discriminatory reason, supported by credible evidence, for not renewing the plaintiff's contract, then the burden remains with the plaintiff to prove, by a preponderance of the evidence that the defendant's asserted reason was not the real reason for not renewing the plaintiff's contract." It was in this fashion that the adjective "credible" insinuated itself into the instructions about what the jury was to consider in determining whether the BHA had articulated and presented evidence of a lawful reason for not renewing Scott's contract. There was no objection to that aspect of the instructions, nor is that to be wondered at, as the use of the word credible occurred in one instance over thirteen pages of instructions.

[8]The special verdict slip contained parallel questions as to the defendant Firth.

answered question two in a manner that (as they were instructed) involved a credibility assessment of the BHA's evidence of a legitimate, nondiscriminatory reason for its employment action. We are persuaded by the jury's answer to the fourth and fifth special verdict questions that the jurors combined the questions and that they found that the BHA had discriminated against Scott on the basis of age, i.e., with discriminatory animus. The fourth question asked the jurors to find the compensation due Scott "for each of the following losses or harms, if any, caused by the [BHA's] discrimination against Mr. Scott because of his age." The fifth question was:

> "Did the defendant [BHA] know or have reason to know that its conduct with respect to Mr. Scott in August of 1987 was in violation of the law against age discrimination?"

The jurors answered, "Yes." In their responses to the fourth and fifth questions, the jury in substance made findings that the BHA wilfully had acted with a discriminatory animus. In light of those answers, the error in the jury instructions and the jury's mistaken answer to question two were without consequence. The answers to questions four and five tell us (a) what the jury would have had to say about whether it thought the BHA's proffered reason a real reason; and (b) that it had tied Scott's nonrenewal to unlawful age discrimination.

4. *The motion for judgment notwithstanding the verdict based on insufficiency of the evidence.* At the close of the plaintiff's evidence, the BHA moved for a directed verdict. Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974). The judge denied the motion with the remark, "There is slim evidence to support the Plaintiff's claim at this point. But on the theory that it has been tried twice before, and I do not wish to see it tried a fourth time, if at all possible, I'll let the case go forward. And we'll try and see where it goes from here." When the jury returned their verdict, the BHA moved for judgment notwithstanding the verdict.

The question before a court in the case of a motion for a directed verdict and in the case of a motion for judgment notwithstanding the verdict is the same: whether anywhere in the evidence, applying it in the light most favorable to the plaintiff and without weighing the credibility of the witnesses or

otherwise considering the weight of the evidence, any combination of circumstances could be found from which a "jury could reasonably return a verdict in favor of the plaintiff, i.e., whether from the evidence it was possible to draw enough reasonable inferences to make out the elements of the plaintiff's case." *Hall* v. *Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84, 89-90 (1987). See *Forlano* v. *Hughes*, 393 Mass. 502, 504 (1984); *Waite* v. *Goal Sys. Intl., Inc.*, 55 Mass. App. Ct. 700, 701 (2002).

In his direct case, the plaintiff Scott testified, in summary, that he had been let go at age 48 and that others, younger than he, had been retained doing construction supervision work. In addition, the general construction superintendent, Firth, had found work for his younger brothers-in-law and cousin. Evidence no better than the plaintiff's say-so is an extraordinarily weak basis for taking the case to the fact finder, but it is evidence and, if credited, might carry the day. The plaintiff's evidence at this stage tends to be viewed with considerable tolerance. See *Abraham* v. *Woburn*, 383 Mass. 724, 727-730 (1981).

The BHA's case enhanced the inferences that could be drawn in favor of the plaintiff. Although the BHA introduced evidence in support of its insufficient funds defense, the agency's evidence also permitted the inference — with a good deal less stretching — that there was money enough to hire Firth's relatives. As the evidence stood at the close of the case, the jury were entitled to disbelieve the BHA's reason for not renewing the plaintiff's contract. The BHA introduced evidence that it had retained, as construction supervisors, men aged 61, 57, 47, and 46 — older or close to Scott's age of 48. Nevertheless, Scott was let go and some younger men in his line of work were retained until 1992, when the BHA ended the force account program. It is likely that had we been fact finders, we would have found that not rehiring Scott had everything to do with nepotism and nothing to do with age discrimination, but the jury's finding of age discrimination, on the evidence, was not irrational. *Abraham* v. *Woburn, supra.*

*Judgment affirmed.*

BERRY, J. (concurring). I agree that affirmance is in order after three trials and a clear and strong jury finding of discriminatory animus reflected in the jury's "yes" answer to a special question that the defendants, the Boston Housing Authority (BHA) and Robert Firth, knew or had reason to know that their actions ending Scott's work under contract were in violation of age discrimination law. To be sure, the jury's harmonious and discerning answers to seventeen special questions reflect a comprehensive jury analysis, with consistent and reasoned determinations that wilful age discrimination had been proved and that substantial damages were just and warranted to redress that discrimination. This explains the jury's substantial monetary award of $173,600 in lost wages and benefits as damages against the BHA and the $74,400 in such damages against the codefendant Firth, rather than a more paltry damage award. Similarly, the jury deemed substantial damages were warranted for infliction of emotional distress in the amount of $45,500 and $19,500 against the BHA and Firth respectively.[1]

I write this separate concurrence because (1) there is a compelling basis for affirmance not referenced in the majority opinion, which is that the failure to object to the special questions constituted a waiver and forecloses appellate review; and (2) in contrast to the majority opinion, I believe the pertinent special question and related jury instruction were correct in applying a credible evidence standard to the BHA's burden of introducing, and the jury's need to find, credible evidence of a legitimate, nondiscriminatory reason for the employment action,

---

[1]To be borne in mind is that, in appellate review of a denial of a motion for judgment notwithstanding the verdict, such as presented here, "the standard is 'whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff. . . . In applying this standard, we examine the evidence in the light most favorable to the plaintiff.' " *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 304 (1997), quoting from *Forlano* v. *Hughes*, 393 Mass. 502, 504 (1984). Here, the jury's consistent answers to the special questions manifested findings, based on the evidence viewed in the light most favorable to the plaintiff, that the BHA's proffered reason of reduced funding was fake and that the termination and Scott's loss of the work he had done for twelve years was because the defendants found him to be the one old enough and dispensable enough to make way for Firth's relatives. Firing the old in contravention of discrimination law is not exclusive to making room unfairly for relatives in acts of nepotism.

not, as the majority suggests, just the production of any evidence, whether credible or not.

1. *The doctrine of waiver and the failure to preserve the issue for appellate review.* Given the defendants' lack of objection to the special questions before submitted, when returned, or prior to discharge of the jury, and given the absence of objection to the jury instructions relating to the special questions, the law of waiver is clear. See *Neagle* v. *Massachusetts Bay Transp. Authy.,* 45 Mass. App. Ct. 345, 348 (1998) ("Pursuant to Mass.R.Civ.P. 49(a), this failure [to object to the special question] resulted in a waiver of the plaintiff's rights . . . [including the right] to raise the issue on appeal"); *Fortier* v. *Essex,* 52 Mass. App. Ct. 263, 265 (2001) ("There was no further discussion of, or objection to, the form of the questions. The plaintiffs' arguments regarding the special verdict questions cannot be raised for the first time on appeal. Mass.R.Civ.P. 49(a), 365 Mass. 812-813 [1974]").[2,3] In similar mode, there was no objection lodged to the jury instructions that connected to the subject special questions, again leaving the point unpreserved for appellate review.

The waiver is clear and explicit when one considers that the

[2]In support of my view that the appellate issue was *not* preserved in this case, I note that in *Lipchitz* v. *Raytheon Co.,* 434 Mass. 493, 499 (2001), the issues had been properly preserved for appellate consideration by objection: "[The defendant] Raytheon submitted a written request for an instruction that [the plaintiff] Lipchitz had the burden of proving that Raytheon's reasons for not promoting her were a 'pretext for discrimination.' [The defendant] renewed the request after the judge charged the jury and before the jury retired to deliberate. . . . The issue was preserved for appellate review." Similarly, in *Abramian* v. *President & Fellows of Harvard College,* 432 Mass. 107, 115 (2000), the defendant had preserved objections to the special question and related jury instructions and "thus the issue is preserved for appellate review."

[3]The Federal rule is in accord as to waiver. As the United States First Circuit Court of Appeals recently decided in *Babcock* v. *General Motors Corp.,* 299 F.3d 60, 63-64 (1st Cir. 2002), "We have held that under Rule 49(b) [relating to verdicts on special questions], objections to the inconsistency of verdicts must be made after the verdict is read and before the jury is discharged. E.g., *Merchant* v. *Ruhle,* 740 F.2d 86, 89 (1st Cir. 1984); *Skillin* v. *Kimball,* 643 F.2d 19, 19-20 (1st Cir. 1981). Consistent with those precedents, we hold that [the defendant] forfeited its objection to the alleged inconsistency by failing to object at the critical time. See *McIsaac* v. *Didriksen Fishing Corp.,* 809 F.2d 129, 134 (1st Cir. 1987). To decide otherwise would countenance 'agreeable acquiescence to perceivable error as a weapon of appellate advocacy.' *Id.* (quoting *Merchant,* 740 F.2d at 92)."

BHA's counsel, after the charge and before the jury retired to deliberate, in direct response to an inquiry that the judge had directed be "for the record," expressed contentment with the special questions and the written jury instructions. To that end, the clerk made inquiry, to which counsel for the BHA responded affirmatively, "Counsel for the defendants are satisfied with the form and the written instructions that were given to the jury."

The Supreme Judicial Court has reaffirmed that, notwithstanding recent developments in the law of employment discrimination, an issue cannot be raised on appeal that was not preserved by objection in the trial court. See *Cormier* v. *Pezrow New England, Inc.*, 437 Mass. 302, 311 (2002), wherein the court denied review of a challenged pretext instruction, notwithstanding that the law regarding pretext had been one subject of the recent developments: "[F]or the first time on appeal [the defendant] argues that the judge's instructions to the jury concerning pretext were erroneous because he failed to instruct the jury that [the plaintiff] was required to prove discriminatory animus and causation. *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 501-504 (2001). [The defendant] has waived this issue because it failed to object to the instructions at trial. See Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974)."

2. *The credible evidence standard.* In connection with an employer's burden of introducing evidence of a legitimate, nondiscriminatory reason for the its employment actions, the majority opinion sets up a dialectic between introducing *credible evidence* versus introducing *any evidence*, whether credible or not. Then, suggesting the standard should be the production of any evidence, the majority states that because credible evidence was the standard applied, there was "error in the jury instructions and the jury's mistaken answer to question two." *Ante* at 294. I do not agree that there was such error.

The majority focuses on special question two and the related jury instructions, which charged that, if the jury found that,

> "the defendant has articulated *a legitimate non-discriminatory reason supported by credible evidence* for not renewing the plaintiff's contract, then the burden remains with the plaintiff to prove by a preponderance of

the evidence that the defendant's asserted reason was not the real reason for not renewing the plaintiff's contract" (emphasis added).

The majority suggests that this instruction, the related special question, and the jury's response were erroneous because "the BHA *had articulated* and *had presented evidence* of a legitimate, nondiscriminatory reason for not renewing Scott's contract," *ante* at 292, and, at this stage in its deliberations, the jury's consideration "does not involve a credibility assessment" of the BHA's evidence concerning its employment action (emphasis in original). *Ibid.* Rather, according to the majority, the BHA and Firth merely had a burden of production of some evidence; the jury need not have found the evidence credible.

This is a novel construction of the jury's determinations in the trial process in an employment discrimination case. Indeed, the majority opinion acknowledges that "[m]any of the cases describe the defendant's obligation in phase two as having to produce 'credible' evidence to support its articulated reason for the employment action taken against the plaintiff," *ante* at 292 n.7, citing *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 442 (1995), and *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997). However, adverse to this precedent, the majority opinion concludes that "[t]he addition of the adjective 'credible' is likely to be confusing to jurors who, untutored in exquisite legal distinctions, will reasonably understand that deciding whether credible evidence has been received means deciding whether they believe, i.e., credit, that evidence." *Ante* at 292 n.7. In the final analysis, the majority finds that although "the adjective 'credible' insinuated itself into the instructions," *id.*, this alleged error, not objected to, was rendered "without consequence" because of the clear findings of discrimination in other special questions. *Ante* at 294.

I do not join in this part of the analysis in the majority opinion. I believe that the special question and related jury instruction correctly stated — in accord with existing precedent (as the majority acknowledges) — that the defendants had to present *credible evidence* of a lawful, nondiscriminatory reason for their employment decision not to renew the plaintiff's contract. Even looking to recent employment discrimination

decisions, the Supreme Judicial Court has not changed the law concerning the credible evidence standard.[4] In *Lipchitz* v. *Raytheon Co.*, 434 Mass. at 506, the court noted that "the evidence suggested several reasons for [the employer's] decision . . . *some of which the jury could have found credible, some of which the jury might have found not credible*" (emphasis added). That is precisely the case here. While there was some evidence that there was reduced funding on one project, there was also countervailing evidence that monies were contemporaneously available to fund jobs for newly hired relatives of Firth, including for the position of crew supervisor, which the plaintiff had held. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 116-117 (2000), wherein the court stated that proof of unlawful discrimination "may be accomplished by showing that the reasons advanced by the employer for making the adverse decision are not true," and "[i]n the second stage, the employer can rebut the presumption by articulating a lawful reason or reasons for its employment decision *[and] produc[ing] credible evidence* to show that the reason or reasons advanced were the real reasons" (emphasis added; citation omitted).

In this case, the jury were surely not compelled to accept the BHA's fictitious suggestion that there was no money to continue the plaintiff's contract, while the defendants found funds to hire relatives of Firth as new contractors who, in contrast to Scott, had not had longstanding employment.

---

[4]That the question is one of credible evidence for the fact finding jury is also supported in *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 774-775 (2001) (analyzing under *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437 [1995], whether the employer had advanced credible evidence of a lawful reason for its employment action). See *Blare*, *supra* at 442; *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 134-136 (1976). Accord *Lewis* v. *Area II Homecare for Senior Citizens, Inc.*, 397 Mass. 761, 767 (1986) ("[T]he record clearly shows that the defendants introduced credible evidence to show that the articulated reasons were not pretexts").